# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 22, 2020 Session

## STEPHEN BOESCH v. JAY R. HOLEMAN, ET AL.

**Appeal from the Chancery Court for Sevier County**
**No. 16-5-164     Telford E. Forgety, Jr., Chancellor**

_____

### No. E2019-02288-COA-R3-CV

_____

This appeal concerns a disassociated partner's buyout. Stephen Boesch ("Boesch"), Jay Holeman ("Holeman"), and Richard Fraser ("Fraser") formed a partnership to start a flavored-moonshine and whiskey business, Tennessee Legend. Boesch contributed technical know-how and labor. Early on, Boesch was disassociated from the partnership. Boesch sued Holeman and Fraser ("Defendants," collectively) in the Chancery Court for Sevier County ("the Trial Court") alleging, among other things, misappropriation of trade secrets. Later, Crystal Falls Spirits, LLC, an entity created by Holeman, intervened to sue Boesch. At trial, the parties put on competing proof as to the value of Boesch's interest. Ultimately, the Trial Court adopted Defendants' value and rejected Boesch's trade secrets claim. Boesch appeals. Because the experts failed to contend with Tenn. Code Ann. § 61-1-701, which governs the determination of a disassociated partner's buyout price when a partnership is not dissolved, we reverse and remand for a new determination in keeping with the statute's requirements. Otherwise, we affirm the Trial Court's judgment. We, therefore, affirm in part, and reverse, in part, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Stephen Boesch, pro se appellant.

Brian T. Mansfield, Sevierville, Tennessee, for the appellees, Jay Holeman, Richard Fraser, and Crystal Falls Spirits, LLC.

# OPINION

## Background

In 2014, Boesch, Fraser and Holeman formed a partnership to sell flavored-moonshine and whiskey. Toward that end, the men came up with a business plan for what became known as Tennessee Legend. No written agreement was executed. Holeman was the so-called "money man" of the operation. He was to contribute $300,000. Fraser and Boesch were to contribute "sweat equity." Holeman created Crystal Falls Spirits, LLC, d/b/a "Tennessee Legend" to serve as a conduit through which the partnership acted; Boesch never was a member of the LLC.

Boesch was the only one of the three men with any experience in this line of business. Boesch provided the formulas necessary to mix the product. He asserts that these formulas were his alone and were never meant to belong to the partnership. Boesch also has a background in air conditioning. Using this experience, he worked on a building owned by Holeman but used by the partnership.

Unfortunately, tension emerged fairly quickly. Boesch and Fraser did not get along. On December 15, 2015, only a few months after the business opened, Boesch was disassociated from the partnership. Boesch and Defendants present contrasting accounts of why this happened. In Boesch's account, he essentially was expelled. According to Defendants, Boesch left of his own volition after issuing an ultimatum that Fraser had to go or he would go. In either event, on December 15, 2015, Boesch was out at Tennessee Legend. Defendants carried on with the business using the formulas Boesch had provided. In time, the business grew.

In May 2016, Boesch sued Defendants in the Trial Court seeking permanent injunctive relief and damages. Boesch alleged that "Defendants continue to use Boesch's Trade Secrets in the business venture." Among the claims asserted by Boesch were fraud and violation of the Uniform Trade Secrets Act. Alternatively, Boesch alleged that Defendants breached their fiduciary duties by terminating him and stealing his trade secrets. Additionally, Boesch alleged that Defendants benefited from Boesch's labor and skills but failed to pay him just compensation.

In June 2016, Defendants filed an answer and counterclaim. Defendants acknowledged that they, along with Boesch, had entered into a business arrangement to form and operate Tennessee Legend. However, they denied Boesch's account of how he came to leave the business. Defendants stated that Boesch "became unhappy, disenchanted, unable to work or communicate with Defendant Fraser and presented to Defendant Holeman an 'ultimatum', threatening that either Defendant Fraser 'had to go'

or Boesch would, himself, leave the business, which he did." Defendants also denied that Boesch brought any trade secrets to the business that were his rather than the partnership's. Defendants denied that they failed to compensate Boesch for his labor. In their counterclaim, Defendants asserted that Crystal Falls Spirits, LLC was an indispensable party and that Boesch, by his actions, had vacated any rights or claims to Tennessee Legend. Defendants sought damages and injunctive relief to the extent the Trial Court were to find that any proprietary rights extended to them individually.

The lawsuit expanded as Crystal Falls Spirits, LLC moved to intervene and filed a proposed intervenor's complaint against Boesch. Crystal Falls Spirits, LLC alleged, among other things: "[T]o the extent the recipes, formulas, processes and techniques constitute 'trade secrets' under Tennessee law, they are the trade secrets of Crystal Falls Spirits, LLC. Accordingly, Defendant Boesch should be *permanently enjoined* from claiming or using such 'trade secrets' for his own benefit or the benefit of others." (Emphasis in original). In July 2016, the Trial Court entered an agreed protective order forbidding the parties from disseminating information pertaining to recipes, formulas, etc., except for purposes of this litigation. The Trial Court also entered an order allowing Crystal Falls Spirits, LLC to intervene.

Boesch filed an answer to Crystal Falls Spirits, LLC's complaint, wherein he stated that he was unaware of Tennessee Legend's use or registration of his trade secrets: "[I]t is admitted that the State of Tennessee regulates liquor production, sales, etc., and the formulas and trade secrets of Mr. Boesch were used for operation of the Tennessee Legend business. Registration and use of the trade secrets of Mr. Boesch were without full knowledge of Mr. Boesch." In November 2017, Boesch filed a counterclaim against Crystal Falls Spirits, LLC, alleging in part that "Boesch is entitled to an award of one-third (1/3) interest in the distillery business (i.e., Tennessee Legend and Crystal Falls), as well as any of the business(es) assets," and seeking dissolution of the LLC. In December 2018, Crystal Falls Spirits, LLC filed an answer to Boesch's counterclaim.

Trial began on December 12, 2018. At trial, Boesch and Defendants disputed issues such as whether he was reimbursed for his labor and whether the parties intended that Boesch's formulas would remain his alone. Another contested issue was what value to place on Boesch's one-third interest in the partnership. Boesch testified that he claimed a one-third interest in the business because "[w]hen we started the business, I was one-third owner I was told." Regarding a December 30, 2015 letter he sent to Holeman through his lawyer demanding that Tennessee Legend stop using his formulas, Boesch testified: "When I was thrown out of the business, I was told -- I asked about my formulas and I was told I wasn't getting paid anything for my formulas, so this was written. I guess it's a cease and desist for the formulas for Tennessee Legend to stop using my formulas." Boesch described what the formulas consist of: "The formulas are everything that goes into the

flavored products. It's not just flavoring. It's several other components. It's how much alcohol, how much water, just kind of like the recipe for baking a cake. I mean, it's everything you need to go into it to make that final product." Boesch placed the value of his formulas at $15,000 to $20,000 apiece. Boesch testified that he performed labor such as work on a building, owned by Holeman but used by the partnership, that went uncompensated. On cross-examination, Boesch was asked about his trade secrets claim:

Q. Well, how are they secret?
A. Because I was the only one that knew about them up until that point.
Q. What point?
A. That they started being used at Tennessee Legends. And I guarded the secret there. I didn't give them out to anybody and I didn't let them because they weren't involved in it.
Q. What do you mean didn't let them?
A. Well, they weren't involved in any of the production processes, so they - -
Q. Did you keep that away from Mr. Fraser and Mr. Holeman?
A. Sure.
Q. You did?
A. Yes.
Q. So they weren't aware. So you secretly produced the formulas at the business?
MR. HALL: Objection, we're mischaracterizing Mr. Boesch's prior testimony, Your Honor. He keeps going over and over the same issues with regard to --
THE COURT: Overruled.
A. It's not something that I brought them in and said, hey, look, here are my formulas. It's something that I kept the records I had to and then kept the formulas then to myself. The only secrets you really have in this industry are your formulas. Everything else can be ascertained from the internet, I guess. The knowledge to put that information to use is a different story. But the only secrets you have are your formulas, so, yes, those were my trade secrets.
Q. Well, but you used them in the business for yourself and for your partners to hopefully make money, didn't you?
A. Yes, I used them in the business, yes.
Q. In the partnership?
A. Yes.
Q. To make money to furtherance of the business?
A. I guess you could say that, yes.
Q. They were the partnership's to use, correct?
A. No, they were not the partnership's to use.

-4-

Q. Okay. All right. Your testimony is that you didn't develop, tweak, change, do anything with the formulas there at the business, you did it all before?
A. Not all of it, no.
Q. Some of it you did there?
A. Some of it, yes.
Q. Now, all of these formulas, we have produced, you've seen the filings, the registrations of all of these?
A. Yes.
Q. Those are all in the name of Crystal Falls, LLC; is that correct?
A. Yes.
Q. And also, I think, Mr. Holeman's name is also reflected on those registrations, correct?
A. Yes.
Q. And yours are not?
A. Correct.

Continuing his testimony, Boesch stated:

Q. Did you come up with the term "royalty"?
A. I think I came up with the term "royalty".
Q. I mean, what are you saying this is, you're saying it's in exchange for them paying you $20,000.00, they get to keep it, they get to use it, they get to what?
A. For $20,000.00, they can keep it.
Q. Was there an agreement to that, was there some understanding about that, was that some part of the partnership? Tell me how this came about.
A. No, no. This came about when they continued to use my formulas after they ejected me without my permission.
Q. And if I total that up correct, if it's 15 products there, that's $300,000.00.
A. Yes.
Q. So if I understand this correctly, you're asking for -- so $59,000.00 less $11,000.00, $48,000.00 we'll call it here on unreimbursed expenses.
THE COURT: 115.
MR. MANSFIELD: Plus the 67.
THE COURT: 115.
Q. Plus the 300.
A. Correct.
Q. And then plus what your expert is going to testify about is your value in the business; is that right?
A. Correct.

Q. So I've seen his report, it's $300,000.00 something thousand dollars, so you think you're entitled to $750,000.00?
A. Plus attorney fees.
Q. Plus attorney fees.
A. Correct.
Q. For a business that just started up, hadn't been in business for three months before you left.
A. That had great potential.
Q. It had potential. It also had potential to fail.
A. Great potential for success, I believe.
Q. And so you're telling this Court you're entitled to $750,000.00 on royalties and labor that was never contracted for and your claim for unreimbursed expenses that are based upon your credit card statements, that's what you're wanting from this Court?
A. Not just the credit card statements, but there's other information that was submitted in there as well, but, yes.

Both sides presented expert testimony regarding the value of Boesch's one-third interest. The experts' detailed valuation reports were entered into the record. Robert Parker ("Parker"), an expert in the field of business valuation and accounting, testified for Boesch. For his valuation analysis, Parker looked to August 2017, nearly two years after Boesch's disassociation. Parker concluded that Boesch's interest was worth $258,300. Parker testified as to why he chose the date he did for his analysis:

Q. And then you were asked to do a calculation of value. Tell me a calculation of value of what precisely. What were you asked to value? What was your -- you were to do a calculation of value of what interest, what time period, that type of thing? I'm trying to bracket this in.
A. A one-third interest in Crystal Falls Spirits, LLC, was what I was to determine the calculated value on.
Q. As of when?
A. As of when. I won't say I was given a specific date, other than we do need to try to assess the December 2015 date to see what a value was then. So the information that I had allowed me to do a calculation and come up with an estimate as of August 2017. And using that information, because information was limited, and then I discounted to come up with a 2015 value or estimate.
Q. And I'm a little confused about that, Mr. Parker, because you indicate in here in your report that you show an estimated fair value 33 and a third percent non-marketable member interest as of August 31, 2017. You indicate in here a couple of times that that's your valuation date, as of that date.

A. That's right.

Q. And it seems to be you took all the data, all the information available to you, and determined a value as of that date, right?

A. Uh-huh.

Q. I mean, that's what your report says.

A. Uh-huh.

Q. And then almost as a footnote, you then take just a discounted calculation and put that back to December 15th of 2015; is that right?

A. That's correct.

Q. So what you didn't do is you did not purport to in your calculation of value engagement to directly determine a value as of December 15th of 2015. You did a different date, a different valuation based on that data.

A. That's true.

In deposition testimony entered as an exhibit, Fraser, one of Boesch's erstwhile partners, testified to how and why the partnership was formed, as well as what Boesch brought to the table:

Q. Were there ever any writings that represented what the partnership agreement was to entail and how it would be managed?

A. No.

Q. Was there ever a partnership or any other document that was created to identify how the business would be managed since Mr. Boesch was told to leave?

A. No, sir.

Q. Do you agree with Mr. Holeman that this whole business began as a partnership between the three of you and no one else has had an ownership interest in it?

A. Yes, sir.

\*\*\*

Q. I think Mr. Mansfield asked a question of Mr. Boesch, he phrased it, when Mr. Boesch was -- when they brought you on. Was Mr. Boesch brought into this by you guys or did someone contact Mr. Boesch about being a partner?

A. Steve and I met first, either I bumped into him somehow. I'd been gone for three years, you know. And when I was talking to Steve and he said he worked for Davy Crockett, but he wasn't happy there and he was thinking he wanted to do something else or get -- do something, but he wasn't happy there. And I was looking for something to do. I said, well, why don't we -- let's get a distillery started. He says, that's cool. He says, I'm in. So I said,

we just need to find a money guy. He's my best friend, a man I trust right there. So I really put the whole thing together as far as getting everybody together. But he indicated he wanted to quit Davy Crockett.

Q. So relative to when -- do you know when Mr. Boesch left Davy Crockett?

A. I don't remember.

Q. But then, I guess, after he left Davy Crockett, you guys got together and said, okay, let's make this happen?

A. Yes.

Q. And I want to clear this up and make sure I understand. Is anybody suggesting, are you suggesting that Mr. Boesch did anything inappropriate with regard to Davy Crockett formulas or --

A. He had that book, the booklet with all the formulas. We had gone by and visited him, but he had the booklet in his car. I remember he told me that that was the formulas for all -- that's where all the stuff that was made at Davy Crockett. And I do remember him telling me later, maybe it was a week or two, I can't remember when, that he had to give it back…. But anyway, he did tell me he had the formulas from Davy Crockett with him.

Q. But to your knowledge, were any of those formulas used for Tennessee Legend?

A. I would assume so.

A deposition of Boesch's other partner, Holeman, also was entered as an exhibit. In his deposition, Holeman testified to the nature of the three men's business relationship:

Q. Is there any writing between the Crystal Falls Spirits, LLC, and the partnership, any agreement, anything in writing with regard to what that relationship is?

A. Not to my knowledge.

Q. Okay. Tell me what that relationship is.

A. We were -- we acted as partners, and at such time as Steve's non-compete expired and we could have put him on the books, we could have made him a member of the LLC, and that was the intention.

Q. So was it the intention then that the LLC would essentially have three members and that's the way it was supposed to function?

A. Yes.

Q. And those membership interests or control of that LLC was with the partnership?

A. Yes.

Q. And those three partners, again, were yourself, Mr. Fraser, and Mr. Boesch?

A. Yes.

-8-

Q. Were there tax returns prepared for the business for 2015, partnership or the LLC?

A. I'm sure there were.

Q. And let me go back a step, go back to that connection between the partnership and the LLC. So, in essence, the partnership was being run through the LLC?

A. Yes.

Q. So whatever the partnership did, it was incorporated into the LLC, and the books for the LLC represented what the partnership was entitled to and what had taken place in the partnership?

A. Yes.

Defendants' business valuation expert Renee Harwell ("Harwell") took the stand but trial adjourned before her examination was complete. Some nine months passed before trial resumed. On September 19, 2019, the second and final day of trial, Harwell resumed her testimony. Harwell valued Boesch's partnership interest at $23,000. In reaching this figure, Harwell applied certain discounts. Harwell explained her approach as follows:

Q. … Okay. Now, you have got two, two discounts here.

A. Uh-huh.

Q. A discount for lack of control?

A. Uh-huh.

Q. And discount for lack of marketability?

A. Correct.

Q. If you would, in somewhat layman terms, explain why those are in there and what they do. What's the purpose?

A. Okay. When you cannot control whom you hire or fire or what gets distributed from a company, what assets you buy, you have little control. And at a one-third interest, you have little to no control. You may protest, but that doesn't mean you'll be heard.

Q. A willing buyer out here, are they going to discount their interest in this business if they realize that they're going to have a lack of control in the management, in the distributions, the operations, anything regarding the business?

A. They will.

Q. Significantly?

A. Significantly. What impacts a lack of control will be cash flow. If you have a company that perhaps it's real estate and it has a long history of distributing cash no matter what, then you're not as concerned about the control because you have cash.

Q. That is not this company?

A. That is not this company.

Q. Okay. Then the discount for lack of marketability, tell the Court about that.

A. Lack of marketability is, can you go out and sell this company easily, quickly? So if you have stock in a publicly traded market, you can go to your brokerage account, sell your stock, and have your cash in between one and three days. Very liquid. With a company, a one-third interest, you have to find a buyer for it. That can take years, if you can even sell the one-third interest at all….

Q. And so the 20 percent of marketability discount, again sort of converting this to layman's terms, it's a discount -- it's a discount to reflect that there is not a particularly good market out there to sell a one-third interest in a small, closely held, nonpublic business?

A. That's correct.

Q. That hasn't even generated income?

A. That's correct.

Q. And is losing money?

A. That's correct. So we could argue how much is lack of control, how much is lack of marketability. Rather than getting into the semantics, combine them together, it's a lack of -- it's a third interest, you don't have control and you don't have market, what's the total haircut, the total discount you take off a hundred percent interest value.

Ultimately, the Trial Court adopted Harwell's valuation of Boesch's interest. In October 2019, the Trial Court entered a judgment for Boesch in the amount of $23,000 against Defendants and Crystal Falls Spirits, LLC, jointly and severally. The Trial Court dismissed Boesch's other claims as well as any remaining third-party claims. In its order, the Trial Court stated, in relevant part:

> This matter came before the Court on the 12th day of December, 2018 and the 19th day of September, 2019, for trial upon the original Complaint, Counterclaim, Intervening Complaint and Counterclaim thereto. Upon consideration of the extensive testimony and evidence presented over two days of hearing, the applicable law, the argument of counsel and the entirety of the record, the Court finds that the Plaintiff failed to meet the burden of proof on his claims asserting violation of the Tennessee Uniform Trade Secrets Act, unreimbursed expenses, labor charges and royalties, all of which were presented at trial. The Court further finds that the remaining issue was a determination of the value of the Plaintiff's one-third (1/3) interest in the partnership and business venture, a matter of which the parties offered competing evidence, including the reports and opinions of expert witnesses.

Having given due and proper consideration of the testimony of the Plaintiff's expert and the Defendant's expert, as well as their reports submitted into evidence, the entirety of the evidence and the applicable law, the Court finds that the determination of value submitted by the Defendant of $23,000.00 is best supported and sustained.

Boesch filed a motion to alter or amend and a motion for discretionary costs. In December 2019, the Trial Court entered its final order in which it denied Boesch's motions. Boesch timely appealed to this Court.

## Discussion

Although not stated exactly as such, Boesch, now acting pro se, raises the following issues on appeal: 1) whether the nine month delay between hearing dates prejudiced Boesch; 2) whether the Trial Court erred in declining to find a violation of the Tennessee Uniform Trade Secrets Act; 3) whether the Trial Court erred in declining to grant Boesch a one-third share in a building he worked on that was owned by Holeman but used by the business; and 4) whether the Trial Court erred in its determination of the business's value for purposes of determining Boesch's buyout price. Defendants and Crystal Falls Spirits, LLC raise a separate issue of whether Boesch's brief is so deficient as to justify waiver of his issues.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding the deference we extend to trial courts' determinations of witness credibility, our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

We first address whether Boesch's brief is so deficient that his issues should be deemed waived. Boesch's brief is deficient. In contravention of Tenn. R. App. P. 27(a)(6), Boesch's brief contains no statement of facts. We are mindful that Boesch is acting pro se on appeal. As this Court explained in *Young v. Barrow*:

Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000); *Paehler v. Union Planters Nat'l Bank, Inc.*, 971 S.W.2d 393, 396 (Tenn. Ct. App. 1997). The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. *Irvin v. City of Clarksville*, 767 S.W.2d 649, 652 (Tenn. Ct. App. 1988). However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe. *Edmundson v. Pratt*, 945 S.W.2d 754, 755 (Tenn. Ct. App. 1996); *Kaylor v. Bradley*, 912 S.W.2d 728, 733 n. 4 (Tenn. Ct. App. 1995).

*Young v. Barrow*, 130 S.W.3d 59, 62-63 (Tenn. Ct. App. 2003).

Boesch's failure to include a statement of facts in his appellate brief is a major omission. However, Boesch cites to the record fairly regularly throughout his brief. We have no difficulty understanding what Boesch is arguing, whether convincingly or not, or what part of the record he is referring to. While Boesch's brief is deficient, it is not so deficient as to thwart appellate review. We, therefore, decline to find waiver in this instance, and press on with deciding this matter.

Moving to Boesch's issues, we begin with whether the nine month delay between hearing dates prejudiced Boesch. Boesch presented his proof on the first day of trial, December 12, 2018. Boesch argues that Defendants and Crystal Falls Spirits, LLC were advantaged by the ensuing nine month delay because they had additional time after hearing his part of the case to prepare their own case and that the Trial Court's memory of the first day of trial was hazy. When trial resumed on September 19, 2019, the Trial Court remarked on the delay:

THE COURT: Counsel, you had said you feel very confident we'll be able to finish this thing. Here's the bottom line. We need to finish it. We need to finish it. I have spent most of yesterday going back -- I didn't read the transcript, by the way. I read my notes. Of course, they're not a transcript. But I read my notes, read the depositions again. And I'll tell you, I don't

-12-

ever intend again, especially on a case like this, to try part of it one day and come back eight or nine months later. I don't ever intend to do that again. And you know, running through my mind, okay, what do you do about it? Because I know no lawyer can tell you exactly how long a case is going to take. No lawyer can do that, no judge can do that. It's just an impossibility.

MR. MANSFIELD: I mean, I struggled with it, too, Your Honor. I had to go back and relearn it. I agree with that. I don't know the answer. I don't know what we estimated when we set it at the docket sounding. I can't say if we said one day. I do not know. This case has clearly morphed over time. So in any event, it is what it is. My thought was maybe reviewing the transcript may have been some benefit. But the Court may have thought that was inappropriate. I don't know.

THE COURT: Oh, no, no.

MR. MANSFIELD: It takes a lot of time.

THE COURT: Thank you for doing it and getting it. I just didn't -- and I spent, like I say, most of yesterday. I had a short day court wise. But went from about, I don't know, 10:00 in the morning until about 2:30 in the afternoon, with no lunch break. And in reading what I did read, and I could not have read -- could not have read the transcript. I read my notes. And I went back and looked at the exhibits and read the depositions, but that's it.

MR. MANSFIELD: We'll try to press on, Your Honor.

THE COURT: Okay.

As the Trial Court itself recognized, the nine month delay between hearing dates was excessive and unacceptable. However, Boesch has cited to no Tennessee law in support of his contention that the delay necessitates overturning the Trial Court's judgment. The record does not show the reasons for this delay. We are unable from the record to discern any prejudice suffered by Boesch, either. The record reflects that the Trial Court reviewed its notes and was up to date on the evidence presented already. Based on this record and contrary to Boesch's contentions, the Trial Court was not ignorant of the case at the time it ruled; it simply ruled against Boesch. That Boesch did not obtain the outcome he desired does not, in itself, show he was prejudiced in any way by the regrettable delay. We decline to vacate or reverse the Trial Court's judgment on this basis.

We next address whether the Trial Court erred in declining to find a violation of the Tennessee Uniform Trade Secrets Act. Boesch argues that the formulas he contributed to Tennessee Legend were his personal trade secrets and not the partnership's. He contends that his former partners misappropriated these trade secrets by continuing to use them after he disassociated. In response, Defendants and Crystal Falls Spirits, LLC state that such information can easily be found on the internet and does not constitute a trade secret. To decide this issue, we look to the Tennessee Uniform Trade Secrets Act, which defines the relevant terms thusly:

As used in this part, unless the context requires otherwise:

(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means;
(2) "Misappropriation" means:
(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
(i) Used improper means to acquire knowledge of the trade secret; or
(ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
(a) Derived from or through a person who had utilized improper means to acquire it;
(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;
(3) "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity;
(4) "Trade secret" means information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

-14-

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702 (2013). The Uniform Trade Secrets Act provides for injunctive relief and damages for misappropriation of a trade secret as defined above. *See* Tenn. Code Ann. §§ 47-25-1703; 47-25-1704.

In view of the broad definition of "trade secret" set out above and the facts of this case, we are unpersuaded by Defendants' and Crystal Falls Spirits, LLC's argument that the formulas do not qualify as trade secrets. We note that in July 2016, the Trial Court entered an agreed protective order limiting dissemination of information about the formulas. This suggests to us that both sides recognize the formulas are of some value and that their secrecy should be guarded. It is understandable why. Although one may very likely find formulas online, Tennessee Legend uses these.

Nevertheless, Defendants and Crystal Falls Spirits, LLC argue that, even if the formulas are classified as trade secrets, they belong to the partnership and not Boesch personally. We agree. Despite his baffling testimony to the contrary, the formulas clearly were intended for the partnership's use. The formulas belong to the partnership rather than Boesch and are part of what makes up the partnership's value. We affirm the Trial Court's conclusion that Tennessee Legend's ongoing use of formulas Boesch contributed to the partnership does not constitute a violation of the Uniform Trade Secrets Act.

We next address whether the Trial Court erred in declining to grant Boesch a one-third share in a building he worked on that was owned by Holeman but used by the business. Boesch states that his labor was a capital contribution to the partnership. Boesch argues that, as a result of this contribution, the building came to be owned by the partnership and should be considered in the determination of his buyout price. Boesch cites to Tenn. Code Ann. § 61-1-204(c) (2018), which provides: "Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one (1) or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership."

We disagree with Boesch's characterization of his work on the building, as well as his interpretation of its effect. Boesch's labor was part of his "sweat equity" contribution to the partnership. It was part and parcel of getting the business started, not a purchase of property with partnership funds. We affirm the Trial Court on this issue. While we decline to find that the building was rendered partnership property by Boesch's work on it, Boesch is entitled to his buyout price from the partnership as a whole, which we turn to next.

The fourth and final issue we address is whether the Trial Court erred in its determination of the business's value for purposes of determining Boesch's buyout price. Boesch contends that Harwell's report and testimony, upon which the Trial Court based its determination of value, was flawed in the following ways: (1) Harwell's report relied wrongly on profit and loss statements that recorded loan repayments instead of owner draws; (2) Harwell's report relied wrongly upon profit and loss statements that reported exorbitant salaries and rent payments as expenses rather than owner draws; and (3) Harwell's report did not contend with the applicable law, Tenn. Code Ann. § 61-1-701, in that she applied a lack of control discount. Boesch argues also that he is entitled to an award of interest.

Boesch's first and second sub-arguments implicate the live testimony and credibility of the witnesses, and we extend deference to the Trial Court's findings in that area. The evidence does not rise to the clear and convincing standard such that would cause us to overturn the Trial Court's implicit credibility determinations. However, Boesch's third point regarding whether the valuations properly contended with the applicable law is on firmer ground.

From our review of the transcripts, there was some uncertainty at trial as to which law to apply in determining Boesch's one-third interest–that concerning LLCs, or that concerning partnerships. In the end, the valuation proceeded without a definitive answer. Indeed, the ambiguity reflects and is consistent with the ambiguity with which the parties conducted their business. The LLC, created by Holeman, acted as a sort of conduit through which the partnership operated. However, Boesch never was a member of the LLC. On appeal, there is no dispute as to the nature of the arrangement. Both sides describe the three men's business arrangement as a partnership. The Revised Uniform Partnership Act defines a "partnership" generally as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit...." Tenn. Code Ann. § 61-1-101(7) (2018). This definition fits the facts of the business arrangement in this case. Thus, the law on partnerships is implicated.

Regarding a scenario such as here where a partner is disassociated but the partnership is not dissolved and wound up, Tenn. Code Ann. § 61-1-701 provides, in part:

(a) If a partner is dissociated from a partnership without resulting in a dissolution and winding up of the partnership business under § 61-1-801, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subsection (b).

(b) The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under § 61-1-807(b)

-16-

if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.

Tenn. Code Ann. § 61-1-701 (a)-(b) (2018).

The Uniform Law Comment to Tenn. Code Ann. § 61-1-701 explains:

Under subsection (b), the buyout price is the amount that would have been distributable to the dissociating partner under Section 807(b) if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of liquidation value or going concern value without the departing partner. Liquidation value is not intended to mean distress sale value. Under general principles of valuation, the hypothetical selling price in either case should be the price that a willing and informed buyer would pay a willing and informed seller, with neither being under any compulsion to deal. The notion of a minority discount in determining the buyout price is negated by valuing the business as a going concern. Other discounts, such as for a lack of marketability or the loss of a key partner, may be appropriate, however.

The parties agree liquidation value is of no use here. The relevant portion of the statute therefore is "the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date." Tenn. Code Ann. § 61-1-701(b) (2018). With this in mind, we look to the expert report relied upon by the Trial Court in determining Boesch's buyout price. Harwell's report certainly is thorough and detailed. However, Harwell's report applied a discount for lack of control in tandem with a discount for lack of marketability. Although in her testimony Harwell minimized the importance of the distinction between these discounts, the distinction matters with respect to the applicable statute, Tenn. Code Ann. § 61-1-701. While a discount for lack of marketability as to the entire partnership business and not as to the minority partnership interest may be appropriate, a discount for lack of control by the minority partnership interest is inappropriate because the statute calls for determining value based on a sale of the *entire* partnership business as a going concern. We note that under the Trial Court's ruling as affirmed by this Court, the formulas are an asset of the partnership and must be considered as such in the value determination of the entire partnership business. Only then can Boesch's one-third interest properly be determined. Harwell's report, extensive and informative though it is, does not contend with Tenn. Code Ann. § 61-1-701. As the Trial Court's valuation decision was based upon Harwell's report applying a lack of control and lack of marketability discount to Boesch's minority

partnership interest, we reverse the Trial Court's valuation of Boesch's interest in the partnership's business for purposes of Boesch's buyout price and remand for a new valuation determination consistent with Tenn. Code Ann. § 61-1-701. The proper date of valuation is December 15, 2015, the date of Boesch's disassociation. Pursuant to Tenn. Code Ann. § 61-1-701(b), Boesch is entitled to an award of interest from December 15, 2015 through the date of payment.

In sum, we reverse the Trial Court's valuation of Boesch's partnership interest. We remand for a new valuation that comports with Tenn. Code Ann. § 61-1-701. On all other issues, we affirm the judgment of the Trial Court.

### Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed one-half against the Appellant, Stephen Boesch, and his surety, if any, and one-half against the Appellees, Jay Holeman, Richard Fraser, and Crystal Falls Spirits, LLC.

_____
D. MICHAEL SWINEY, CHIEF JUDGE